No. 13-7105

# In the United States Court of Appeals for the District of Columbia Circuit

_____

UNITED STATES OF AMERICA, EX REL. ANTHONY OLIVER
APPELLANT

*v.*

PHILIP MORRIS USA INC.,
A VIRGINIA CORPORATION, FORMERLY KNOWN AS PHILIP MORRIS, INC.,
APPELLEE

_____

*ON APPEAL FROM THE U.S. DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
NO. 08-0034, HON. COLLEEN KOLLAR-KOTELLY, DISTRICT JUDGE*

_____

## BRIEF OF APPELLEE
## PHILIP MORRIS USA INC.

_____

THOMAS J. FREDERICK
*Winston & Strawn LLP*
*35 W. Wacker Drive*
*Chicago, IL  60601*
*(312) 558-5600*

ELIZABETH P. PAPEZ
ANDREW C. NICHOLS
ERIC M. GOLDSTEIN
ERIC T. WERLINGER
*Winston & Strawn LLP*
*1700 K Street, N.W.*
*Washington, DC 20006*
*(202) 282-5000*
*epapez@winston.com*

*Counsel for Appellee
Philip Morris USA Inc.*

## CERTIFICATE OF PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rules 26.1 and 28(a)(1), Philip Morris USA Inc. ("PM USA") certifies as follows:

Parties and Amici:   Plaintiff-Appellant Anthony Oliver and Defendant-Appellee PM USA were parties to the operative (Second Amended) complaint in the United States District Court for the District of Columbia.  The United States chose not to intervene.  (Dkt. 28.)  There are no intervenors or amici on appeal.

Oliver's original and First Amended Complaints named the following entities as defendants:  PM USA's predecessor Philip Morris, Inc., Altria Group, Inc., R.J. Reynolds Tobacco Company, Reynolds American, Inc., Brown & Williamson Tobacco Corporation, Lorillard Tobacco Company, Loews Corporation, and British American Tobacco, PLC.  Oliver omitted these defendants from his Second Amended Complaint, and they are not parties to this appeal.

PM USA is a wholly owned subsidiary of Altria Group, Inc., which is publicly held and has no parent company.  No publicly held company owns 10% or more of the stock of Altria Group, Inc.  Altria Group, Inc. is the only publicly held company that owns 10% or more of PM USA's stock.

Rulings Under Review:  Oliver appeals the June 13, 2013, final judgment entered by the United States District Court for the District of Columbia, (Kollar-Kotelly, J.), granting PM USA's motion to dismiss this case for lack of subject

matter jurisdiction.  *See* No. 08-0034, *United States ex. rel. Anthony Oliver v. Philip Morris USA Inc.*, --- F. Supp. 2d ---, 2013 WL 2637032 (D.D.C. 2013).

Related Cases:  No related case is pending before this or any other court, and this case has never previously been before this Court.

<table>
<tr><td>Thomas J. Frederick<br>*Winston & Strawn LLP*<br>*35 W. Wacker Drive*<br>*Chicago, IL  60601*<br>*(312) 558-5600*</td><td>/s/ Elizabeth P. Papez<br>Elizabeth P. Papez<br>Andrew C. Nichols<br>Eric M. Goldstein<br>Eric T. Werlinger<br>*Winston & Strawn LLP*<br>*1700 K Street, N.W.*<br>*Washington, DC 20006*<br>*(202) 282-5000*<br>epapez@winston.com</td></tr>
</table>

*Counsel for Appellee*
*Philip Morris USA Inc.*

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF PARTIES, RULINGS UNDER REVIEW,
AND RELATED CASES ........................................................................... i

TABLE OF CONTENTS ........................................................................ iii

TABLE OF AUTHORITIES ................................................................... v

INTRODUCTION .................................................................................. 1

STATEMENT OF ISSUES ON APPEAL ............................................. 4

PERTINENT STATUTES ..................................................................... 4

RELEVANT FACTUAL & PROCEDURAL BACKGROUND ............ 5

    A.    The False Claims Act ............................................................. 5

    B.    AAFES and NEXCOM MFC Provisions .............................. 6

    C.    This Suit ................................................................................. 8

    D.    Oliver's Operative FCA Allegations .................................... 10

    E.    Proceedings Below ............................................................... 11

SUMMARY OF THE ARGUMENT .................................................... 18

STANDARD OF REVIEW ................................................................... 23

ARGUMENT ........................................................................................ 24

I.    THE DISTRICT COURT CORRECTLY DISMISSED THIS SUIT
    AS JURISDICTIONALLY BARRED. ........................................... 24

    A.    The Jurisdictional Bar Applies Because the "Transactions" or
        "Elements" of Oliver's FCA Claims Were Publicly Disclosed. ......... 25

        1.    The Iceland Memo Alone Disclosed a Pricing Disparity
            Sufficient to Trigger the Public Disclosure Bar ..................... 26

2.    The District Court's Reliance on the Military's MFC
Provisions Also Clearly Supports the Jurisdictional Bar..........31

B.    Oliver Cannot Escape the Jurisdictional Bar Because He Is Not
an "Original Source" of the Allegations in His Complaint.................38

1.    The SAC Fails to Plead Original Source ..................................38

2.    Oliver Offers No Basis for Applying the Original Source
Exception Even If It Were Properly Pled ..................................39

3.    Oliver's Original Source Claim, Even If Adequately
Pled, Was Not Properly Presented to the Government
Prior to Suit .............................................................................42

II.    AFFIRMANCE IS ALSO WARRANTED ON THE ALTERNATE
GROUND THAT OLIVER CANNOT PLEAD AN FCA CLAIM. ............45

A.    Oliver's Brief Confirms That He Cannot Adequately Plead the
MFC Violations on Which His FCA Claims Depend.........................46

B.    Oliver's Brief Also Confirms That He Cannot Adequately
Plead the Elements of His FCA Claims Under Rules 8 and 9(b). ......50

1.    Oliver Fails Adequately to Plead Fraud....................................51

2.    The SAC Also Fails Adequately to Allege Materiality
and Scienter .............................................................................52

CONCLUSION ............................................................................................56

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

iv

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc.*,
525 F.3d 8 (D.C. Cir. 2008) .................................................................23

*\*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...................................... 22, 23 40, 46, 47, 51, 54

*Atherton v. D.C. Office of Mayor*,
567 F.3d 672 (D.C. Cir. 2009) .........................................21, 22, 23, 55

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ..............................................................................23

*Conley v. Gibson*,
355 U.S. 41 (1957) ................................................................................23

*Empagran S.A. v. F. Hoffman-LaRoche, Ltd.*,
315 F.3d 338 (D.C. Cir. 2003) ............................................................23

*Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*,
130 S. Ct. 1396 (2010) ..................................................................6, 24

*Jones v. Bernanke*,
557 F.3d 670 (D.C. Cir. 2009) .........................................24, 39, 45, 52

*Jones v. Horne*,
634 F.3d 588 (D.C. Cir. 2011) ............................................................23

*Kaempe v. Myers*,
367 F.3d 958 (D.C. Cir. 2004) ............................................................50

*Kennard v. Constock Res., Inc.*,
363 F.3d 1039 (10th Cir. 2004) ...........................................................35

*Laborers' Pension Fund v. Blackmore Sewer Constr., Inc.*,
298 F.3d 600 (7th Cir. 2002) .................................................................9

\*  Authorities upon which we chiefly rely are marked with asterisks.

*Marshall Cnty. Health Care Auth. v. Shalala*,
  988 F.2d 1221 (D.C. Cir. 1993) ......................................................... 50

*O'Toole v. Northrop Grumman Corp.*,
  499 F.3d 1218 (10th Cir. 2007) ........................................................... 9

*Rockwell Int'l Corp. v. United States*,
  127 S. Ct. 1397 (2007) ........................................................... 5, 12, 39

\*Schindler Elevator Corp. v. United States ex rel. Kirk*,
  131 S. Ct. 1885 (2011) ........................................ 3, 20, 21, 31, 35-38

*United States ex rel. Davis v. Dist. of Columbia*,
  679 F.3d 832 (D.C. Cir. 2012) ................................... 28, 34, 43, 44

*United States ex rel. Davis v. Prince*,
  753 F. Supp. 2d 569 (E.D. Va. 2011) ............................................... 29

*United States ex rel. Digital Healthcare, Inc. v. Affiliated Computer Servs., Inc.*,
  778 F. Supp. 2d 37 (D.D.C. 2011) .................................................... 29

*United States ex rel. Durcholz v. FKW, Inc.*,
  189 F.3d 542 (7th Cir. 1999) ........................................................... 56

\*United States ex rel. Findley v. FPC-Boron Emps.' Club*,
  105 F.3d 675 (D.C. Cir. 1997) .............................. 3, 6, 19, 20, 34, 37

*United States ex rel. Gross v. AIDS Research Alliance-Chi.*,
  415 F.3d 601 (7th Cir. 2005) ........................................................... 39

*United States ex rel. Harrison v. Nat'l Semiconductor Corp.*,
  105 F.3d 650, 1997 WL 3637 (4th Cir. Jan. 7, 1997) ....................... 55

*United States ex rel. Joseph v. Cannon*,
  642 F.2d 1373 (D.C. Cir. 1981) ....................................................... 22

*United States ex rel. Meyer v. Horizon Health Corp.*,
  565 F.3d 1193 (9th Cir. 2009) ......................................................... 35

*United States ex rel. Purcell v. MWI Corp.*,
  824 F. Supp. 2d 12 (D.D.C. 2011) ................................................... 29

*United States ex rel. Rost v. Pfizer, Inc.*,
   507 F.3d 720 (1st Cir. 2007)..............................................................35

*\*United States ex rel. Settlemire v. Dist. of Columbia*,
   198 F.3d 913 (D.C. Cir. 1999)..... 12, 16, 17, 19-21, 24, 25, 28, 33-34, 39-41, 45

*United States ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.*,
   214 F.3d 1372 (D.C. Cir. 2000)..........................................................52

*\*United States ex rel. Springfield Terminal Ry. Co. v. Quinn*,
   14 F.3d 645 (D.C. Cir. 1994).....................6, 12, 20, 21, 26, 27, 29-33, 37, 40-44

*United States ex rel. Totten v. Bombardier Corp.*,
   286 F.3d 542 (D.C. Cir. 2002)............................................................46

*United States ex rel. Ven-A-Care v. Actavis Mid Atl. LLC*,
   659 F. Supp. 2d 262 (D. Mass. 2009)..................................................29

*United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*,
   525 F.3d 370 (4th Cir. 2008)..............................................................51

*United States ex rel. Williams v. Martin-Baker Aircraft Co., Ltd.*,
   389 F.3d 1251 (D.C. Cir. 2004)..........................................................52

*United States ex rel. Williams v. NEC Corp.*,
   931 F.2d 1493 (11th Cir. 1991)..........................................................35

*U.S. Foodservice, Inc. v. United States*,
   100 Fed. Cl. 659 (2011).....................................................................47

*United States v. Philip Morris Inc., et al.*,
   No. 1:99-CV-02496-GK (D.D.C.).......................................................13

*\*United States v. Sci. Applications Int'l Corp.*,
   626 F.3d 1257 (D.C. Cir. 2010)................................... 6, 21, 46, 51-55

## STATUTES & RULES

31 U.S.C. § 3729(a) ................................................................4, 46

31 U.S.C. § 3730....................................................................11

31 U.S.C. § 3730(b)(1)..............................................................5

31 U.S.C. § 3730(b)(4)(A) ...........................................................5

31 U.S.C. § 3730(d) ...................................................................5

*31 U.S.C. § 3730(e)(4)(A) ...............................16, 24, 25, 28

*31 U.S.C. § 3730(e)(4)(B) ...................................18, 39, 42

31 U.S.C. § 3731(b)(1) .............................................................33

*Fed. R. Civ. P. 8 ...................................................46, 52, 55

*Fed. R. Civ. P. 9 ...............................14, 15, 47, 52, 53

Fed. R. Evid. 201 ......................................................................9

Pub. L. No. 111-148, § 10104(j)(2), 124 Stat. 119 (2010) ....................................24

**OTHER AUTHORITIES**

*Kick, North Carolina Flue-Cured Tobacco*,
    TryKick.com, http://www.trykick.com ...........................9

NEXCOM General Provisions Publication No. 61,
    https://www.mynavyexchange.com/command/contractor_vendor/PUBS/p
    df/ P61-9091.PDF ...............................................................14

AAFES Supplier Requirements and Terms and Conditions,
    http://www.shopmyexchange.com/doingbusiness/ ...........................14

# GLOSSARY

**AAFES**:          Army and Air Force Exchange Service

**DoD**:             United States Department of Defense

**FCA**:             False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

**Iceland Memo**:   Memorandum Philip Morris USA Inc. published online

**JA**:              Joint Appendix

**MFC**:             Most Favored Customer

**NEXCOM**:          Navy Exchange Service Command

**OBr.**:            Appellant Anthony Oliver's Opening Brief

**PM USA**:          Philip Morris USA Inc.

**PMI**:             Philip Morris International, Inc.

**Relator**:        Anthony Oliver

**SAC**:             Second Amended Complaint

# INTRODUCTION

After four years and three complaints which the United States declined to join, the District Court dismissed Appellant Anthony Oliver's *qui tam* suit against Appellee PM USA as jurisdictionally barred.  Oliver's opening brief confirms that dismissal was proper for the reasons in the District Court's opinion, and because his latest complaint otherwise fails to state a claim.

Oliver's sole contention on appeal is that the District Court erroneously relied on a particular public document to apply the *qui tam* statute's jurisdictional bar to this suit, (Oliver Br. ("OBr.") 18), and thus allegedly prevented Oliver, a self-described "tobacco company insider," from using this case to expose PM USA's purported overpricing of certain cigarette sales to the military.  (*Id*. 19.)  These arguments are foreclosed by the law and record.  Oliver is no whistleblower and has no inside information about the decade-old pricing claims the District Court rightly dismissed as inactionable.  He is the head of a discount tobacco company that sells cigarettes to the military and markets its products by accusing its competitors of fraud.  This meritless suit, which Oliver has repeatedly publicized and features on his company website, (*see infra* at 8 n.2), is simply a page from that playbook.

Oliver filed this case in January 2008 alleging that PM USA and several other tobacco companies violated the federal False Claims Act ("FCA") by overcharging the United States for cigarettes the Government purchased for resale at military

exchanges overseas.  These claims, on which Oliver originally sought more than $16 billion in remedies, turned on the defendants' allegedly false certifications of compliance with the "most-favored customer" ("MFC") requirements in military procurement regulations.  (JA 15-16, ¶¶ 14, 19.)  Oliver brought these claims to the Justice Department during a period of "unprecedented" and "extraordinary" FCA enforcement.  (JA 36.)  But after four years of investigation across two administrations, the Government declined to intervene.  (Dkt. 28.)

Undeterred, Oliver filed a Second Amended Complaint that abandoned all but his MFC allegations against PM USA.  PM USA moved to dismiss on two grounds.  First, this suit is barred by the FCA's jurisdictional provisions because Oliver's claims rest on information in the public domain, namely, government procurement requirements and a public document disclosing the very pricing disparity Oliver alleges here.  Second, Oliver in any event fails adequately to plead that PM USA breached its MFC obligations, much less deliberately certified otherwise in government bills.  After carefully considering the parties' submissions, the District Court held that the case "must be dismissed" for "lack of subject matter jurisdiction" because "Oliver's claims are based on publicly disclosed information of which Oliver is not the original source."  (JA 273.)

This Court should affirm.  The pricing disparity Oliver cites in his brief is the same disparity (between Government and PM USA affiliate pricing) disclosed

in a 1999 memo that PM USA produced in government litigation and published online years before Oliver filed suit.  (JA  71; OBr. 5.)  Oliver does not deny that the memo was public for FCA purposes, and his assertion that it cannot support the jurisdictional bar, (OBr. 26), is foreclosed by circuit precedent.  (JA 266-70.)

Oliver is thus left to argue that the District Court's decision discourages "potentially valuable" claims by "whistleblowers," (OBr. 30, 32), and applies the jurisdictional bar in a manner that conflicts with Congressional intent and the law of other circuits.  (*Id*. 31.)  These arguments fail under the authorities in Oliver's own brief, notably the Supreme Court's 2011 decision in *Schindler Elevator Corp. v. United States ex rel. Kirk*, 131 S. Ct. 1885 (2011).  *Schindler* holds that the FCA's jurisdictional bar applies to suits in which a relator merely combines knowledge of a defendant's legal obligations with factual information available from public sources (there, FOIA records; here, online databases).  *Id.* at 1894.  And this Court has long held that such suits are barred even if the relator "learned about the [alleged] fraud independent of the public disclosures."  *United States ex rel. Findley v. FPC-Boron Emps.' Club*, 105 F.3d 675, 678 (D.C. Cir. 1997).  This case falls squarely within these precedents, (JA 273), and is precisely the kind of "opportunistic" action the FCA does not permit.  Accordingly, the Court should affirm its dismissal on the jurisdictional grounds in the District Court's opinion, or on the alternate ground that the operative Second Amended Complaint fails to state a claim.

## STATEMENT OF ISSUES ON APPEAL

1.    Did the District Court correctly dismiss Oliver's Second Amended Complaint as jurisdictionally barred because its "claims are based upon publicly disclosed information of which Oliver is not the original source"?  (JA 273); and

2.    Does the District Court's judgment merit affirmance regardless of the jurisdictional bar because the Second Amended Complaint fails to plead an FCA claim under Rules 8 and 9(b)?

## PERTINENT STATUTES

In addition to the provision listed in Oliver's brief, the following subsection of the FCA is pertinent to this appeal:

**(a)** Liability for certain acts.—Any person who—

> **(1)** knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

  . . . .

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person[.]

31 U.S.C. § 3729(a)(1) (2009).

4

## RELEVANT FACTUAL & PROCEDURAL BACKGROUND

### A.    The False Claims Act

The FCA prohibits "false or fraudulent claims for payment to the United States."  *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 463 (2007) (citing 31 U.S.C. § 3729(a)).  To incent individuals with knowledge of such fraud to come forward, the Act authorizes civil actions "to be brought by . . . private individuals in the Government's name."  *Id.*; 31 U.S.C. § 3730(b)(1) (2009) (now codified at 31 U.S.C. § 3739(b)(1) (2012)).  These individuals, known as "relators," are entitled to litigate the case, share in any favorable judgment, and recover attorneys' fees, 31 U.S.C. § 3730(d) (2012), but only if their claims comply with certain statutory requirements.

The FCA requires relators to file their suits under seal so the Department of Justice can investigate their claims and decide whether to intervene before the complaint is served on the defendant.  31 U.S.C. § 3730(b)(4)(A) (2012).  Where, as here, the Government declines intervention, (Dkt. 28), the relator's ability to proceed is subject to several limitations, two of which are central to this appeal.

*First*, the Act's "public disclosure bar . . . deprives courts of jurisdiction over *qui tam* suits when the relevant information has already entered the public domain through certain channels," unless the relator is the "original source" of the information.  *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel.*

5

*Wilson*, 559 U.S. 280, 285 (2010). The goal of the bar is to provide "adequate incentives for whistle-blowing insiders with genuinely valuable information" to come forward while "discourag[ing] . . . opportunistic plaintiffs who have no significant information to contribute on their own." *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 649 (D.C. Cir. 1994). To that end, the bar permits a relator to proceed with his claims only where he "played a role in exposing a fraud of which the public was previously unaware." *Findley*, 105 F.3d at 678.

*Second*, where a relator's FCA suit is based on the defendant's alleged breach of a government contract, courts "must be sure . . . that liability . . . attaches only for fraud and not for ordinary breach of contract." *United States v. Sci. Applications Int'l Corp.* ("*SAIC*"), 626 F.3d 1257, 1277 (D.C. Cir. 2010). Accordingly, where, as here, an FCA case is predicated on alleged misrepresentation of contractual compliance, reviewing courts must ensure "strict enforcement" of Rule 9(b) and "the Act's materiality and scienter requirements." *Id.* at 1270.

## B.    AAFES and NEXCOM MFC Provisions

Oliver concedes that his FCA claims turn on MFC provisions that were incorporated in government procurement requirements at all times relevant to this suit. (OBr. 9 n.3; JA 14-16, ¶¶ 14, 16, 19.) The relevant provisions were issued by the Army and Air Force Exchange Service ("AAFES") and Navy Exchange Ser-

6

vice Command ("NEXCOM"), instrumentalities of the U.S. Department of Defense ("DoD") that operate military exchanges at which members of the Armed Forces and their families purchase products. (JA 13, ¶ 7.)  Oliver's allegations in this case concern the prices at which PM USA sold cigarettes to AAFES and NEXCOM for resale at military exchanges overseas.  (JA 18-19, ¶¶ 25-29.)  This point is important because the MFC provisions that govern his claims concern only the prices, terms, and conditions PM USA offers similarly situated non-Government customers for the same products it sells the Government in "comparable" markets.  (OBr. 7-9; JA 15-16, ¶ 16.)  Thus, the MFC provisions are not implicated, much less violated, by sales that involve products, terms, customers, or markets different than the foreign military exchange sales Oliver describes.  (JA 14-21, ¶¶ 10-38 (alleging that PM USA's sales to AAFES and NEXCOM of cigarettes for resale at overseas military exchanges did not comply with MFC requirements, and that PM USA violated the FCA when it allegedly certified otherwise in its bills).)

*AAFES MFC Requirements*.  As Oliver notes, (OBr. 8-10), the AAFES MFC regulation on which he relies appears in AAFES's General Provisions and Supplier Requirements.  From 1995 through 2007, the regulation stated:

> [The net price of products the Contractor offers to AAFES] will be as favorable as, or better than the price the item is being sold by the Contractor to other customers *under the same or similar conditions and in the same general geographical area pursuant to agreements made during the*

*same period*.

(JA 15-16, ¶ 16 (quoting AAFES General Provisions and Supplier Requirements (Nov. 1995), ¶ 3(a)-(b)) (emphasis added)).  Beginning in December 2007, the regulation was updated to require contractors to offer AAFES prices "*comparable to*" the "*prices, terms, and conditions* that have been offered" by the contractor to "any of its customers," and to offer AAFES in writing any price reductions extended to such customers.  (JA 16, ¶ 19); (OBr. 9.)

*NEXCOM MFC Requirements*.   As Oliver also notes, (OBr. 7-8), the NEXCOM MFC requirements on which he relies are set forth in Publication 61 of NEXCOM's General Provisions.  The relevant requirements state:

> The Contractor certifies that *prices, terms and conditions offered* under this contract, including consideration of any discount, rebate arrangements, *do not exceed prices then being charged the Contractor's most favored customer or another military exchange for like items*. . . .  If the Contractor subsequently extends voluntary price reductions, promotional offers or other special items to other customers, the Contractor is obligated to promptly extend them, in writing, to [NEXCOM].

(JA 15, ¶ 14 (quoting NEXCOM, General Provisions, Pub. No. 61 (Apr. 1, 1999) (emphasis added).)

## C.    This Suit

Oliver is the President and CEO of Medallion Brands International Co., a tobacco product manufacturer that seeks to compete with PM USA in selling cigarettes to the U.S. military.  (Dkt. 8, First Am. Compl. ¶ 11.)  Medallion's advertis-

ing campaign for its trademarked brand, Kick, has long centered on allegations that competing manufacturers are "scamming" the Government, and Kick's website continues to urge the military to source from Kick to avoid its competitors' purported overcharges.[1]  Kick's homepage presently features a picture of a pleading from this lawsuit.[2]

The overcharge allegations Kick has long publicized on its website were the centerpiece of Oliver's original complaint, which he filed under seal against PM USA and several other companies in January 2008, and amended that September. (Dkt. 8.)  According to that complaint, Kick's competitors, including PM USA, "scam[med]" the military in two ways.  *First*, the companies allegedly "deceiv[ed]" the military "into believing" that their prices reflected payments required under the companies' widely publicized 1998 Master Settlement Agreement ("MSA") with State attorneys general over tobacco-related health care costs.  (*Id.*

---

[1]  *See Kick, North Carolina Flue-Cured Tobacco*, TryKick.com, http://www.trykick.com (noting that "Kick is a registered trademark of Medallion Brands (MBIC) International Company") (last visited Nov. 21, 2013).

[2]  *See* http://www.trykick.com/home.asp (Reason 3 "For Our Military") (last visited Nov. 21, 2013).  The Court may take judicial notice of the statements on Kick's website because:  (1) the statements' presence can be "readily determined" by visiting the site, which is publicly available in this district, FED. R. EVID. 201; and (2) "[i]t is not uncommon for courts to take judicial notice of factual information found on the world wide web."  *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007); *Laborers' Pension Fund v. Blackmore Sewer Constr., Inc.*, 298 F.3d 600, 607 (7th Cir. 2002).

¶ 12.)[3]   *Second*, the companies allegedly misrepresented that their military sales complied with relevant MFC obligations even though the companies were purportedly charging non-military customers lower prices for the same products they were selling to AAFES and NEXCOM.  (*Id.* ¶ 27.)  Between these two theories of recovery, Oliver sought $243,000,000 in damages from the defendants relating to AAFES sales; up to an additional $42,400,000 in damages relating to NEXCOM sales; and civil penalties of $16,237,860,000.  (*Id.* ¶¶ 68, 72, 74.)

   In September 2011, after investigating these extraordinary claims for nearly four years, the United States notified the District Court that it would not intervene in this case.  (Dkt. 28, JA 6.)  The Amended Complaint was then unsealed, and after several months of delay, Oliver served PM USA.  (Dkt. 33, JA 7.).  In April 2012, Oliver declared that he intended to amend his complaint yet again.  (Dkt. 39, JA 8; Minute Order, Apr. 10, 2012, JA 8.)  Two months later, in June 2012, he filed the Second Amended Complaint ("SAC") at issue in this appeal.  (JA 12-25.)

### D.    Oliver's Operative FCA Allegations

The SAC abandoned all but Oliver's MFC claims against PM USA, and dropped his original source allegations altogether.  (JA12-25).)  Accordingly, and as Oliver's opening brief confirms, (OBr. 4), the operative complaint rests on just

---

[3] Most major tobacco manufacturers, including PM USA's predecessor Philip Morris Inc., signed the MSA to resolve pending and future state claims for costs associated with smoking-related illnesses.  (Dkt. 8, ¶¶ 13-16.)

two basic assertions: (1) PM USA's sale of certain cigarettes to AAFES and NEXCOM violated its MFC obligations because PM USA purportedly sold the same cigarettes to non-military customers (specifically its current affiliate PM Duty Free and former affiliate Philip Morris International ("PMI")) at lower prices; (JA 26; OBr. 10-11); and (2) PM USA violated the FCA by "falsely certifying" compliance with its MFC obligations every time it billed AAFES and NEXCOM for the sales in issue. (OBr. 13; JA 18-21, ¶¶ 26-29, 31-35).)

The SAC's allegations in support of these claims span only five pages, (JA 17-23); offer only one specific example of the purported MFC violations Oliver says PM USA misrepresented to AAFES and NEXCOM, (JA 18, ¶ 26); do not specifically identify any of the allegedly false claims or invoices that Oliver says PM USA knowingly submitted and were material to government payments, (JA 20, ¶¶ 31-33); and do not plead that Oliver was an "original source" of the information underlying these (or any other) claims. (JA 12-25.)

### E.     Proceedings Below

PM USA moved to dismiss the SAC with prejudice for two reasons. (JA 26-150.) *First*, this suit is barred by the FCA's public disclosure provisions, 31 U.S.C. § 3730 (2009), which preclude jurisdiction over FCA suits that "'describ[e] allegations or transactions substantially similar to those in the public domain'" unless the relator qualifies as an "'original source.'" (JA 45-46 (quoting *United*

11

*States ex rel. Settlemire v. Dist. of Columbia*, 198 F.3d 913, 918 (D.C. Cir. 1999), and *Rockwell Int'l Corp.*, 549 U.S. at 460, respectively).) *Second*, the SAC in any event fails to plead the elements of an FCA claim under Federal Rules of Civil Procedure 8 and 9(b).  (JA 51-67; 242-52; 258.)

   *12(b)(1) Grounds for Dismissal.*  PM USA moved to dismiss under the FCA's public disclosure bar because the essential elements of Oliver's FCA claims were in the public domain years before he filed his 2008 complaint.  (JA 45-51; 229-42; 261-73.)  As PM USA explained, this Court's precedents liken a public disclosure that triggers the bar to an equation, "X + Y = Z," where "Z represents the *allegation* of fraud and X and Y represent its essential elements."  *Quinn*, 14 F.3d at 654 (emphasis original).  Accordingly, a transaction-based public disclo-sure occurs when "the combination of X and Y" are "revealed, from which readers or listeners may *infer* Z, *i.e.,* the conclusion that fraud has been committed."  *Id.* (emphasis added).  Applying this test to the SAC establishes that the allegations underlying Oliver's claims were publicly disclosed years before he filed suit.

   The "X" in Oliver's FCA equation—the alleged disparity in PM USA's mili-tary and affiliate pricing, (*see* OBr. 10-11; JA 18-19, ¶¶ 26, 29; 20-22)—was pub-licly disclosed from 2002 onward in what Oliver's brief terms the "Iceland Memo."  (OBr. vi; JA 71, 266-70.)  This 1999 memo, which PM USA produced to the Government in civil litigation, *see United States v. Philip Morris Inc.*, No.

1:99-CV-02496-GK (D.D.C. filed Sept. 22, 1999), and subsequently published online, (JA 45-51; 71-77; 233-42); *see* http://www.pmdocs.com/ (last visited Nov. 21, 2013), states in relevant part:

> PMI Duty-Free list prices are lower than PM USA Military tax-free prices and we frequently receive inquiries from the Service Headquarters on why they can't purchase tax-free product at these lower prices.

(JA 71.)  Accordingly, this price disparity—which is the only specific disparity the SAC alleges—was publicly disclosed at least five years before Oliver filed suit.  It was publicly disclosed in 2002, when PM USA produced the Iceland Memo in government litigation and then uploaded it (pursuant to provisions of the MSA and a later court order) to a publicly available, fully searchable website of discovery materials.  (JA 48-49 (citing circuit precedent)).  And the Iceland Memo was publicly disclosed again in 2003, when it was independently copied to the University of California at San Francisco's public online document archive.  (JA 49 (citing http://legacy.library.ucsf.edu).)   In both databases, the document appears as one of the top five search results simply by entering terms—namely, "philip morris + duty-free + aafes + nexcom"—that identify the parties and the only form of challenged pricing (duty free) Oliver identifies in the SAC.

The "Y" in Oliver's FCA equation—the MFC requirements he cites, (OBr. 8-9; JA 15-16, ¶¶ 14, 16, 19)—were also publicly disclosed years before he filed his 2008 complaint because the relevant MFC language was incorporated in procure-

ment provisions available to the public online or via request to the issuing agencies at all times (2002-2010) relevant to this suit. (JA 14-15, ¶¶ 10-11, 15); https://www.mynavyexchange.com/command/contractor_vendor/PUBS/pdf/ P61-9091.PDF (last visited Nov. 21, 2013) (NEXCOM general Provisions Publication No. 61); http://www.shopmyexchange.com/doingbusiness/ (last visited Nov. 21, 2013) (AAFES Supplier Requirements and Terms and Conditions).

Citing this and other evidence, along with circuit law and Oliver's failure to plead or establish his status as an "original source" of the allegations in the SAC, PM USA moved to dismiss the case as jurisdictionally barred. (JA 26-67; 220-42.)

*12(b)(6) Grounds for Dismissal.* PM USA also moved to dismiss the SAC on the independent ground that it fails to state an FCA claim under Federal Rules of Civil Procedure 8 and 9(b). (JA 51-67; 242-51.) Under circuit precedent applying these rules to *qui tam* cases, Oliver may proceed with his claims only if he can plead—plausibly and with the particularity required by Rule 9(b)—that: (1) PM USA actually violated its MFC obligations; (2) PM USA misrepresented these violations to AAFES and NEXCOM; and (3) PM USA made these misrepresentations knowing that they were both objectively false and material to the agencies' decision to pay for the challenged cigarette sales. (JA 52-67 (citing authorities).) The SAC fails to meet these requirements for a host of reasons, notably that it fails to plead a factual basis for treating the affiliate sales Oliver identifies as

14

"comparable" to AAFES/NEXCOM sales on any of the metrics required for an MFC violation, (JA 242-47), and that it fails to plead the particulars of PM USA's alleged billing fraud as Rule 9(b) and circuit precedent require. (JA 52-67; 249-50.) The SAC also fails properly to allege materiality and scienter—two elements crucial to ensuring that opportunistic relators do not turn ordinary breach-of-contract cases into FCA claims. (JA61-67; 247-51.)

　　　*The District Court's Opinion & Order Dismissing the Case.* After carefully considering the parties' 200-plus pages of briefs and exhibits, the District Court issued a 20-page opinion dismissing the SAC with prejudice. (JA 254-73.) Noting that it "need not address [PM USA's] alternative argument under 12(b)(6)" because the case "must be dismissed under 12(b)(1) for lack of subject matter jurisdiction," (JA 258), the court explained why the FCA's public disclosure bar precludes this suit. (JA 261-73.)

　　　The court began by stating that the FCA's "public disclosure" provision "divests courts of subject matter jurisdiction over suits alleging facts that were publicly disclosed in certain specified forums before the suit was filed, where the individual [bringing the suit] is not an 'original source' of that information." (JA 259.) The court then identified the many reasons the Iceland Memo was "publicly disclosed" for FCA purposes:

　　　　[T]he posting of the [Iceland] Memorandum online in a public, searchable database pursuant to a settlement agreement and subsequent court order con-

15

> stitutes disclosure both in a "civil hearing" and in the "news media" within the meaning of the FCA's public disclosure bar. The re-posting of the document in a text-searchable university database available to the general public likewise constitutes public disclosure in the "news media."

(JA 266.)

The District Court next explained why Oliver's "Complaint describes 'transactions' 'substantially similar to those [the Memo placed] in the public domain,'" and is thus "based upon" public disclosures within the meaning of section 3730(e)(4)(A) and circuit law. (JA 270 (quoting *Settlemire*, 198 F.3d at 918).) Noting that both the Memo and Oliver's complaint focus on the disparity between the prices PM USA charged military distributors (AAFES and NEXCOM) and the prices it charged two specific corporate affiliates (PMI and PM Duty Free), the District Court held that Oliver "cannot dispute that [the Iceland Memo discloses] the same disparate pricing allegation on which his Complaint is premised." (JA 267.) The court then rejected as a matter of fact and law Oliver's argument "that the [Iceland] Memorandum itself does not imply that there is anything wrong with the pricing disparity referenced therein." (JA 268.) "The [M]emorandum plainly discloses" not only the disparate pricing identified in Oliver's complaint, but also that "AAFES and/or NEXCOM—the very entities whom [Oliver] contends were defrauded by [PM USA]—had previously *complained* about (and were therefore necessarily aware of) this pricing differential." (*Id*. (emphasis original).)

Based on its careful analysis of the Memo, the court explained that this disclosure "alone could be viewed as revealing 'transactions' sufficient to 'alert law enforcement authorities to the likelihood of wrongdoing.'" (*Id*.) And it went on to hold that the Memo's pricing disclosures would in any event clearly constitute such an alert when combined with the Government's knowledge of its "*own* [MFC] requirements." (*Id*. (emphasis original) (rejecting Oliver's contrary arguments under circuit law).)

Having found Oliver's claims publicly disclosed, the District Court addressed his arguments that he could proceed notwithstanding the disclosures. The court first rejected Oliver's assertion that he could escape the bar by "provid[ing] additional examples of [the only specific] alleged overpricing" set forth in the SAC. (JA 269.) As the District Court explained, Oliver's purported ability to provide such additional examples "does not change [the] analysis, as it is well-established that 'a relator's ability to reveal specific instances of fraud where the general practice has already been publicly disclosed is insufficient to prevent operation of the jurisdictional bar.'" (*Id*. (quoting *Settlemire*, 198 F.3d at 919).)

The District Court then rejected Oliver's claim that he qualified for the "'original source' exception" to the bar. (JA 273.) The court began by emphasizing that this exception applies only where the relator can demonstrate "direct and independent knowledge of" the publicly disclosed information in his complaint.

17

(JA 270-71.)  The court then held that, despite ample opportunity to do so, Oliver provided "no foundation from which to infer that he had the requisite 'direct and independent knowledge' of the allegations underlying his Complaint," (JA 271), and that even his declaration in opposition to PM USA's motion made "no attempt" "to explain how, exactly, he learned of the alleged fraudulent violations of the 'most favored customer' provisions."  (*Id*. at 271-72 (stressing that Oliver's "declaration states generally that he disclosed '*an* on-going fraud' to the Government, but does not state that he disclosed *this* fraud—that is, the fraud relating to the 'most favored customer' clauses that are the subject of his Complaint") (emphasis original)).  Last, but not least, the District Court held that, even if Oliver had "direct and independent" knowledge of the alleged fraud, his original source claim would fail because he did not "voluntarily provide[] the information to the Government before filing [his] action."  (*Id*. (quoting 31 U.S.C. § 3730(e)(4)(B)).

Having thus thoroughly addressed all of Oliver's arguments opposing dismissal, the Court granted PM USA's motion on jurisdictional grounds and dismissed the case with prejudice.  (JA 253.)  This appeal follows.

## SUMMARY OF THE ARGUMENT

The District Court dismissed this case because, after four years of litigation, three complaints, and hundreds of pages of filings, Oliver offered nothing more than claims "based on publicly disclosed information of which [he] is not the orig-

inal source." (JA 273.)  This judgment is consistent with the Government's deci-
sion not to intervene, and with its decision to "continu[e] purchas[ing]" products
from PM USA "during the time covered by the Complaint." (JA 269.)  Oliver's
opening brief provides no basis for questioning, much less reversing, the District
Court's thorough analysis.  Indeed, Oliver's unsupported challenge to the District
Court's jurisdictional ruling simply confirms that he is *not* a real whistleblower and
thus not a relator who can plead facts necessary to state a viable FCA claim.  Ac-
cordingly, the Court should affirm the judgment for two reasons.

*First*, this suit is jurisdictionally barred by the FCA's public disclosure provi-
sion.  Oliver's assertion that the Iceland Memo cannot support the jurisdictional
bar because it would not alone have "alerted law-enforcement authorities to the
likelihood of wrongdoing," (OBr. 23), fails under the Memo's plain text, (JA 71),
and circuit precedent. *See, e.g.*, *Settlemire*, 198 F.3d at 918 ("It is sufficient that
the 'publicly disclosed transaction is sufficient to raise the inference of fraud.'")
(quoting *United States ex rel. Findley v. FPC-Boron Emps.' Club*, 105 F.3d 675,
687 (D.C. Cir. 1997)).  As the District Court explained, the Memo "unequivocally"
disclosed not only the very price disparity Oliver alleges, but also the military ex-
changes' "complain[ts]" about it. (JA 268-69.)  That is sufficient to trigger the bar,
which applies "whenever the relator files a complaint describing allegations or
transactions substantially similar to those in the public domain, regardless of the

actual source for the information in the particular complaint." *Findley*, 105 F.3d at 682.

Oliver's response that the Iceland Memo alone does not publicly disclose the basis for his fraud claims, (Opp'n 27-29), and that the District Court erred in relying on the Government's MFC requirements to complement the Memo's disclosures, (Opp'n 29-31), is similarly unavailing.  This Court's "transactional" test for FCA disclosures requires only the disclosure of critical "elements" or "transactions" ("X" and "Y") that, taken together, would allow the Government to "infer" or "investigate" the alleged fraud ("Z").  *Settlemire*, 198 F.3d at 918; *Quinn*, 14 F.3d at 356-57.  Here, the "critical elements" of Oliver's FCA claims—namely, disparate pricing of military and affiliate sales ("X") and PM USA's MFC obligations ("Y")—were publicly disclosed online and in federal procurement regulations years before Oliver filed suit.  (JA 261-70.)

Oliver's contention that this combination of disclosures cannot bar his claims because a public disclosure cannot rest on "'legal requirements' that the 'Government is presumed to know,'" (OBr. 29 (quoting JA 268)), is contrary to his own cases, notably the Supreme Court's opinion in *Schindler*.  *Schindler* holds that the relevant version of the FCA bars *qui tam* suits that simply combine government legal requirements (in *Schindler*, federal contract requirements regarding veterans' preferences; here, MFC requirements) with information available through publicly

available sources (in *Schindler*, FOIA searches of agency records; here, online searches of public databases).  131 S. Ct. at 1894.

Oliver's claim that the District Court's analysis departs from *Schindler* (or any other precedent), (OBr. 29-33), is not supported by the authorities he cites. And his assertion that he did not see the Iceland Memo before filing suit, (OBr. 34 n.10 ), is of no moment.  As noted, "'jurisdiction is lacking whenever the relator files a complaint describing allegations or transactions *substantially similar* to those in the public domain, *regardless* of the actual source for the information in the particular complaint.'"  (JA 259-60 (quoting *Settlemire*, 198 F.3d at 918) (emphasis added)); 131 S. Ct. at 1894 (the question is whether "anyon*e* could have" accessed the Iceland Memo "and then filed the same suit").  Because Oliver provides no basis for reversing the District Court's thorough jurisdictional analysis, (JA 261-73), this Court should affirm its dismissal under Rule 12(b)(1).

*Second*, Oliver's own brief and the record independently support affirmance on the grounds that the SAC fails to state an FCA claim.  *See* Fed. R. Civ. P. 12(b)(6).  The factual details that Oliver says are missing from the Iceland Memo, (OBr. 31-33), are *not* necessary to trigger the FCA's jurisdictional bar.  *See, e.g.*, *Schindler*, 131 S. Ct. at 1890; *Quinn*, 14 F.3d at 654.  But they *are* necessary to state an FCA claim under Rules 8 and 9(b).  *See, e.g.*, *SAIC*, 626 F.3d at 1271; *Atherton v. D.C. Office of Mayor*, 567 F.3d 672, 681-82 (D.C. Cir. 2009); *United*

*States ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1385 (D.C. Cir. 1981). Accordingly, the fraud discussion in Oliver's brief simply highlights the deficiencies in his complaint.

For example, Oliver admits that his fraud claims are predicated on MFC violations that require proof of disparate pricing for "comparable" sales. (OBr. 10-13, 29.) Yet his complaint pleads none of the facts (regarding sales terms, customers, markets, or products) necessary to conclude that the only specific pricing disparity it identifies involved "comparable" transactions. This failing alone is fatal to Oliver's case, because the corporate-affiliate sales he cites are *not* comparable for the reasons PM USA explained below, (JA 51-67), and Oliver has the burden of pleading a "plausible" case otherwise. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Atherton*, 567 F.3d at 681-82. He does not come close. Instead, his brief validates PM USA's position by conceding that the entities (PMI and PM Duty Free) that received the allegedly preferential pricing were not on the same level of the distribution chain as AAFES and NEXCOM, so their sales were not comparable under (or even subject to) the MFC provisions he cites. (OBr. 10 n.4.) His brief also confirms even if he could plead an MFC violation (he cannot), he fails adequately to allege that PM USA knowingly misrepresented these purported violations to the Government, or that the alleged misrepresentations (regarding affiliate pricing) would have been material to any particular government contracts or claims.

## STANDARD OF REVIEW

Oliver is correct that this Court reviews jurisdictional dismissals *de novo*. (OBr. 20.)  But he is wrong that "[a] complaint may be dismissed for lack of subject matter jurisdiction only if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"  (*Id.*) (quoting *Empagran S.A. v. F. Hoffman-LaRoche, Ltd.*, 315 F.3d 338, 343 (D.C. Cir. 2003)).  This "no set of facts" language comes from *Conley v. Gibson*, 355 U.S. 41 (1957), which the Supreme Court expressly overruled in *Bell Atlantic Corp. v. Twombly*.  *See* 550 U.S. 544, 563 (2007) ("The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard[.]").  Accordingly, this Court no longer applies it.  *See, e.g.*, *Jones v. Horne*, 634 F.3d 588, 596 n.4 (D.C. Cir. 2011); *Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 17 n.4 (D.C. Cir. 2008).  Instead, the Court considers whether the complaint pleads "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570); *Atherton*, 567 F.3d 672, 681-82 (D.C. Cir. 2009)).  In applying this standard the Court cannot countenance "threadbare recitals of elements" or "conclusory statements," *Iqbal*, 556 U.S. at 678, but can "affirm [the District Court's] judgment on any ground the record supports and that [Oliver] had a 'fair opportunity' to ad-

dress." *See, e.g.*, *Jones v. Bernanke*, 557 F.3d 670, 676 (D.C. Cir. 2009); *Settle-mire*, 198 F.3d at 173 (same).

## ARGUMENT

## I.     THE DISTRICT COURT CORRECTLY DISMISSED THIS SUIT AS JURISDICTIONALLY BARRED.

The FCA provision that controls this case states that "[n]o court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions[:]

[1]   in a criminal, civil, or administrative hearing,

[2]   in a congressional, administrative, or Government Accounting [sic] Office report, hearing, audit, or investigation, or

[3]   from the news media,

unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A) (2009).[4]   Applying this provision, the District Court held that the allegations in the SAC are based on publicly disclosed "transactions" of which Oliver is not an "original source."  (JA 261.)  This Court should affirm.

Oliver does not dispute the District Court's conclusion that the "pricing in-formation in the Iceland Memorandum qualifies as publicly disclosed 'in

---

[4]  Oliver concedes that the 2010 amendments that altered this language, *see* Pub. L. No. 111-148, § 10104(j)(2), 124 Stat. 119 (2010), do not govern this case, (OBr. 3 n.2), because it was pending when the amendments were enacted in March 2010.  *See Graham Cnty.*, 130 S. Ct. at 1400 n.1.

24

a . . . civil . . . hearing . . . as well as 'from the news media.'" (OBr. 2, 23-33.) He also does not dispute that during the period covered by the SAC, the AAFES and NEXCOM MFC provisions were available to the public (either online or via a request to the issuing agencies), and were contained in "the Government's *own* [procurement] requirements." (JA 268 (emphasis original).) He instead focuses his challenge to the District Court's public disclosure analysis on two basic arguments.

First, he argues that the information in the Iceland Memo, however public, is not sufficient to trigger the FCA's jurisdictional bar because "nothing in [the Memo] could have possibly alerted law-enforcement authorities to the likelihood of wrongdoing." (OBr. 23 (quoting *Settlemire*, 198 F.3d at 918); *see also* OBr. 18, 26-32 (arguing that the Memo's pricing disclosure is "innocuous," "spotty," and "vague" because it fails "even [to] say that there was an overcharge" or "otherwise imply there [was] anything wrong").) Second, he argues that even if the Memo did publicly disclose all the critical elements of his claims, he would be entitled to proceed because he is an "original source" of the information the Memo reveals. (*Id.* 33-40.) Both arguments fail.

## A.   The Jurisdictional Bar Applies Because the "Transactions" or "Elements" of Oliver's FCA Claims Were Publicly Disclosed.

As Oliver admits, (OBr. 21), the public disclosure bar applies to "allegations *or* transactions." 31 U.S.C. § 3730(e)(4)(A) (emphasis added)). Accordingly, the bar applies where the "public domain" contains either an allegation of fraud "*or*"

25

"the critical elements of the fraudulent transaction."  *Quinn*, 14 F.3d at 654 (emphasis added).  The "critical" elements are the basic facts that would allow a reader to "*infer* . . . that fraud has been committed." *Id*. at 653-54 (emphasis added).  This standard is easily satisfied here.

### 1.    *The Iceland Memo Alone Disclosed a Pricing Disparity Sufficient to Trigger the Public Disclosure Bar*

As the District Court found, the Iceland Memo that was publicly disclosed through multiple channels in 2002 and 2003 states:

> *PMI Duty-Free* list prices are *lower than PM USA Military tax-free prices* and we frequently receive inquiries from the Service Headquarters [AAFES/NEXCOM] on why they can't purchase tax-free product at these lower prices.

(JA 262 (emphasis added).)  Oliver's brief confirms that "this is the same disparate pricing allegation on which his Complaint is premised."  (JA 267); (*see* OBr. 10.) His brief, like the SAC, ties his case to the assertion that PM USA "purport[ed] to 'sell' cigarette products . . . [to PM USA affiliates] *Philip Morris Duty Free, Inc*. and *Philip Morris International, Inc*. . . . at prices lower than those at which such cigarettes were sold to NEXCOM and AAFES."  (OBr. 10 (citing JA18, ¶ 25) (emphasis added).)

Relying on the passage above, the District Court held that the Iceland Memorandum "plainly discloses Defendant's affiliates' practice of selling cigarettes on the duty-free market at list prices lower than to AAFES and NEXCOM, as well as

the fact that AAFES and/or NEXCOM—the very entities whom Oliver contends were defrauded by Defendant—had previously *complained* about (and were therefore necessarily aware of) this pricing differential." (JA 268.) Accordingly, the District Court held that the Iceland Memo "alone could be viewed as revealing 'transactions' sufficient to 'alert[] law enforcement authorities to the likelihood of wrongdoing.'" (JA 267 (emphasis original) (quoting *Quinn*, 14 F.3d at 654).)

Oliver attacks this conclusion on the ground that the Memo does not support "the district court's characterization of the [AAFES and NEXCOM] 'inquiries' as 'complaints.'" (OBr. 28.) This argument is baseless. AAFES and NEXCOM did not ask "why they can't purchase tax-free product at these lower prices" because they were pleased with their apparent overpayments. (JA 262.) As the Iceland Memo makes clear, they were *complaining* by "frequently" asking why they, too, "can't" enjoy lower prices. (*Id.*) Accordingly, the District Court's view of the Iceland Memo is fully supported by its "plain text." (OBr. 28.)

Oliver further asserts that, whether characterized as complaints or not, the disclosures in the Iceland Memo as too "innocuous" or incomplete to operate as a public disclosure. (OBr. 24-29.) This argument, too, is unavailing. According to Oliver, the Iceland Memo could trigger the disclosure bar only if it contained:

(i)    facts showing that the product . . . was the same and was being sold under substantially similar circumstances so as to trigger the MFC obligations;

27

    (ii)   facts showing that the two Philip Morris entities involved were not separate entities or that their inter-corporate transactions were a means to evade PM USA's MFC obligations; and

    (iii)  facts showing that the certifications of compliance with the MFC obligations were false, and knowingly false.

(OBr. 24.)  Oliver cites no authority for this argument because there is none.  The reason is that his argument improperly conflates the disclosures required to trigger the jurisdictional bar with the facts he must plead to state an FCA claim.  The two are not the same.  If the bar applied only to public disclosures that contained all the "facts" Oliver describes, (*id.*), jurisdictional disclosures would not merely "alert" the Government to the possibility of fraud.  *E.g.*, *United States ex rel. Davis v. Dist. of Columbia*, 679 F.3d 832, 836 (D.C. Cir. 2012) (quotations omitted)).  They would prove the fraud.  That is not the law.

      Under this Court's precedents, the public disclosures that trigger the jurisdictional bar need not be contained in a single source, (OBr. 24), much less one that includes some express "indicia of wrongdoing."  (*Id.* 26); *see Settlemire*, 198 F.3d at 919 ("There is no requirement . . . that the relevant public disclosures irrefutably prove a case of fraud.").  Rightly so, because the detailed factual requirements Oliver suggests, (OBr. 24), could not be reconciled with the bar's application to suits "based upon" "allegations *or* transactions" that are "substantially similar" to those in the public domain.  31 U.S.C. § 3730(e)(4)(A) (emphasis added); *Settlemire*, 198 F.3d at 918 (same).  The handful of district court cases Oliver cites, (OBr. 27),

28

do not hold otherwise.[5]  And Oliver's own filings show that the disclosures here are nothing like the public records *Quinn* deemed too "'innocuous'" to trigger the jurisdictional bar.  (*Id*. (citing 14 F.3d at 653).)  The public phone records in *Quinn* "did *not* suggest any misrepresentation" by the defendant, 14 F.3d at 656 (emphasis added), were *not* accompanied by other disclosures placing "all the material elements of the [alleged] fraud" in "the public domain," *id*. n.11, and revealed information that "no amount of generalized technical expertise could translate" into "a fraud suit."  *Id*.  Here, Oliver's brief establishes the opposite.

Oliver argues that the pricing disparity the Iceland Memo disclosed was nonetheless too "vague" or "innocuous" to permit an inference of MFC fraud because it was accompanied by a "facially reasonable" explanation for the price disparity it disclosed.  (OBr. 29 & n.8.)  But Oliver admits that the public disclosure bar ap-

---

[5] Each case applied this rule to vague or tangential disclosures clearly distinguishable from the specific price disparity the Iceland Memo revealed and Oliver cites here.  *See United States ex rel. Purcell v. MWI Corp*., 824 F. Supp. 2d 12, 22 (D.D.C. 2011) (comparing the complaint's focus on "pump sales" with articles "concentrat[ing] on [certain] business relationship[s]" with no clear relationship to the sales); *United States ex rel. Digital Healthcare, Inc. v. Affiliated Computer Servs., Inc.*, 778 F. Supp. 2d 37, 49 (D.D.C. 2011) (emphasizing that "*none* of the disclosures mention [the defendant], let alone *any* other specific entity" (emphasis original)); *United States ex rel. Davis v. Prince*, 753 F. Supp. 2d 569, 586 (E.D. Va. 2011) (emphasizing that the audit report in issue did *not* "reveal the true facts from which it could be inferred that [certain government submissions] were inaccurate"); *United States ex rel. Ven-A-Care v. Actavis Mid Atl. LLC*, 659 F. Supp. 2d 262, 268 (D. Mass. 2009) (noting that the disclosures spoke only in "generalized industry-wide terms" about "average [cost] figures" not specific to the alleged fraud).

plies where "'the critical elements of the fraudulent transaction were in the public domain.'" (OBr. 22 (quoting *Quinn*, 14 F.3d at 654).) And his own brief identifies the "essential elements of the fraud he alleges" as the "pricing disparities" in his "FCA Complaint" combined with tobacco sellers' "'most favored customer obligations'" and military contract "certification requirements." (OBr. 39-40.) As the District Court held, all of these elements were "in the public domain" when Oliver filed suit. (JA 261-70); *Quinn*, 14 F.3d 656 n.11; (OBr. 10; JA 18-19). And unlike the partial disclosures in *Quinn*, the pricing disparity in the Iceland Memo, particularly when combined with the Government's MFC requirements, was plainly sufficient to suggest the kind of potential "misrepresentation" that triggers the disclosure bar. 14 F.3d at 656.

Oliver's fallback argument that the Iceland Memo would suggest fraud only to someone with his experience as a "CEO of a tobacco company that sells tobacco products to NEXCOM," (OBr. 29, 39), does not save his claims because he does not provide any "substantive information about the particular fraud" beyond that in the public disclosures. *Quinn*, 14 F.3d at 655. The knowledge he asserts, (OBr. 39), is instead (and at most) precisely the kind of "generalized technical expertise" this Court has held *insufficient* to overcome the FCA's jurisdictional limits on *qui tam* suits. *See, e.g.*, *Quinn*, 14 F.3d at 655 (explaining that where "the critical elements of fraud have been publicly disclosed," albeit in "a form *not accessible to*

*most people*, *i.e.*, engineering blueprints on file with a public agency," a relator's "[e]xpertise in the field of engineering would *not* in itself give a *qui tam* plaintiff the basis for suit") (emphasis added); *see also id.* (emphasizing that escaping the disclosure bar requires more than "merely background information which enables a putative relator to understand the significance of a publicly disclosed transaction").

For all of these reasons, the District Court correctly held that the Iceland memo "alone could be viewed as revealing 'transactions' sufficient" to trigger the FCA's jurisdictional bar.  (JA 268.)

### 2.     *The District Court's Reliance on the Military's MFC Provisions Also Clearly Supports the Jurisdictional Bar*

The District Court also correctly held that the bar applies notwithstanding the Iceland Memo's failure to "reference the reason why [the disclosed] pricing differential is of questionable legality," (JA 268), because the "Government's own [MFC] requirements" independently support application of the jurisdictional bar here.  (*Id.* (emphasis original) (citing *Schindler* and stressing that the MFC requirements Oliver cites are "legal requirements that the Government is presumed to know").)  Oliver offers a litany of arguments in response.  (OBr. 28-32.)  None has merit.

 Oliver first argues that the District Court erred in basing its jurisdictional analysis on MFC provisions outside the Iceland Memo because the court itself "acknowledged that, to trigger the public disclosure bar, the Iceland Memo would

have to identify 'transactions' which, taken together, 'could have'" alerted the Government to potential MFC fraud.  (OBr. 23 (citing JA 267).)  That is incorrect. The District Court did not say "the Iceland Memo" itself would have to identify all such transactions.  (JA 267.)  It stated that the bar would apply if *all* the elements or "transactions in the public domain" would suffice to "alert[] the government" to a potential fraud.  (*Id.*)  That was plainly correct.

As Oliver admits, (OBr. 22), a transaction-based disclosure occurs when its elements ("X" + "Y") are "revealed, from which readers or listeners may infer" the "conclusion that fraud has been committed" ("Z").  *Quinn*, 14 F.3d at 654.  Again, the Iceland Memo states:  "PMI Duty-Free list prices are lower than PM USA Military tax-free prices and we frequently receive inquiries from the Service Head-quarters [AAFES and NEXCOM] on why they can't purchase tax-free product at these lower prices."  (JA 267.)  As the District Court held, that is enough to reveal the "X" portion of the potentially fraudulent transaction Oliver alleges, which is that some cigarette purchasers received better prices than the military.  (*Id*. 266-67.)  Indeed, the Memo goes one step further, because it reveals that "the very enti-ties" the SAC says "were defrauded"—NEXCOM and AAFES—had "previously *complained* about (and were therefore necessarily aware of)" the "pricing differen-tial" central to his claims.  (JA 268 (emphasis original).)  And when the "X" of the Memo is combined with the "Y" of the MFC requirements Oliver concedes have

32

been incorporated in government regulations at all times relevant to this suit, the "Z" of potential fraud is obvious.  (*Id*. 268-69.)

Oliver cannot avoid this conclusion by asserting that the Iceland Memo "pertained to a different period from that covered in the Complaint," (OBr. 25), or by offering to provide "additional examples of alleged overpricing" that are not covered by the Complaint.  (OBr. 10-11.)  As a threshold matter, the timing issue Oliver raises is a function of procedural limits on his suit, not of any substantive difference between the allegations in the Memo and his Complaint.  This 2008 case does not allege FCA violations prior to 2002 because such allegations would be barred by the statute's six-year limitations period.  31 U.S.C. § 3731(b)(1).

Further, and regardless, "where the general practice" constituting an alleged fraud "has already been publicly disclosed," a relator's "ability to reveal" later or additional "specific instances" is "insufficient to prevent operation of the jurisdictional bar."  (JA 269 (quoting *Settlemire*, 198 F.3d at 919)); *see also Quinn*, 14 F.3d at 655 ("[A] *qui tam* action cannot be sustained where . . . the *qui tam* relator [simply] comes forward with additional evidence incriminating the defendant.").  Indeed, as this Court "held in *Findley*, disclosures going back as far as *forty years* prior to the relator's lawsuit were sufficient to disclose the practices which formed the basis of the relator's suit."  198 F.3d at 172 (emphasis added).  Here, Oliver challenges PM USA's use from "2002-2010," (OBr. 25), of a "'general practice'"

33

(disparate affiliate versus military pricing) that occurred (and was known to the Government) in 1999. (JA 268-69.) "[J]urisdiction is lacking 'whenever the relator files a complaint describing allegations or transactions *substantially similar* to those in the public domain.'" (JA 270 (emphasis added) (quoting *Settlemire*, 198 F.3d at 918)); *Davis*, 679 F.3d at 836.) Because the allegations in Oliver's complaint are "substantially similar" to (and offer nothing substantive beyond) the information publicly disclosed in the Iceland Memo and military procurement regulations, Oliver's arguments do not take this case outside the disclosure bar. *See, e.g.*, *Findley*, 105 F.3d at 688; *Settlemire*, 198 F.3d at 918.

That Oliver supposedly "did not know about the Iceland Memo until PM USA filed it in this action," (OBr. 34 n.10), is irrelevant. Where, as here, the transactions revealed in the complaint and public disclosures are "substantially similar," the "jurisdictional bar" applies because it "'encompass[es] situations in which the relator's complaint repeats what the public already knows, even though she had learned about the fraud *independent* of the public disclosures.'" (JA 259 (quoting *Findley*, 105 F.3d at 683 (emphasis added))); (*see also* JA259-60 (the "bar is triggered 'whenever the relator files a complaint describing allegations or transactions substantially similar to those in the public domain, *regardless of the actual source* for the information in the particular complaint'" (emphasis added) (quoting *Settlemire*, 198 F.3d at 918)).)

34

Unable to show that the District Court's jurisdictional analysis departs from any law in this Circuit, Oliver seizes on the District Court's reference to the Government's "own" MFC regulations, (JA 268), to argue that its analysis departs from Congressional intent and the law in other circuits. (Obr. 24.) Specifically, Oliver claims that by relying on "'legal requirements' that the 'Government is presumed to know,'" (Obr. 29 (quoting JA 268)), the District Court's opinion improperly reinstates the FCA's superseded "government knowledge" standard for barring claims where disclosures were "contained in government files someplace." (OBr. 30-31.) Again Oliver is wrong. The cases he cites are inapposite, because none prohibits a court from combining the Government's knowledge of federal *legal* requirements with factual information that, like the pricing information here, was publicly available when the relator filed suit. *See United States ex rel. Rost v. Pfizer, Inc.*, 507 F.3d 720, 728 (1st Cir. 2007); *Kennard v. Constock Res., Inc.*, 363 F.3d 1039, 1043 (10th Cir. 2004); *United States ex rel. Meyer v. Horizon Health Corp.*, 565 F.3d 1193, 1200 & n.3 (9th Cir. 2009); *United States ex rel. Williams v. NEC Corp.*, 931 F.2d 1493, 1496 n.7 (11th Cir. 1991). And to the extent Oliver suggests that affirming the District Court will invite a future circuit split by tacitly resurrecting the "government knowledge" test for public disclosures, (Opp'n 31), his argument is foreclosed by *Schindler*.

The relator in *Schindler* was a former employee of the defendant who, like Oliver, was both familiar with the defendant's legal obligations and had a long (and unsuccessful) history of accusing the defendant of misconduct.  131 S. Ct. at 1889.  The case arose because the relator, who knew the defendant was obliged to submit certain hiring reports to the Department of Labor under federal procurement regulations, had his wife submit FOIA requests for the reports and then used them to assert *qui tam* claims that the defendant falsely certified its compliance with federal hiring provisions.  *See id*. at 1890.  In refusing to apply the disclosure bar to these claims, the Second Circuit relied on the same argument Oliver makes here: that applying the bar to the disclosures in issue would "resurrect . . . the government possession standard" for barring *qui tam* claims based on facts present in government files.  (*Id*. at 1894; OBr. 31.)

The Supreme Court reversed.  Emphasizing the disclosure bar's "generally broad scope" and "broa[d] sweep," the Court construed it to reach the FOIA reports in issue.  *See* 131 S. Ct. at 1891.  As the Court explained, any other construction would allow "anyone [to] identify a few regulatory filing and certification requirements, submit FOIA requests until he discovers a federal contractor who is out of compliance, and potentially reap a windfall in a *qui tam* action under the FCA."  *Id*. at 1894.  So too here.  In this case, as in *Schindler*, endorsing the relator's position would mean that "anyone could identify a few regulato-

ry . . . requirements," search public or online sources "until he discovers a federal contractor who is out of compliance, and potentially reap a windfall in a *qui tam* action under the FCA." *Id*.

That Oliver says *he* did not take this route (without saying what route he *did* take), (OBr. 39), is again irrelevant.    As noted, "the jurisdictional bar . . . encompass[es] situations in which the relator's complaint repeats what the public already knows, even though she had learned about the fraud *independent* of the public disclosures." *Findley*, 105 F.3d at 683 (emphasis added).  And Oliver's contention that the District Court nonetheless erred in using a "far-fetched" and "hypertechnical" disclosure to trigger the bar, (OBr. 37), is both unsupported and beside the point.  It is unsupported because two separate online databases produce the Iceland Memo as one of the top five search results to a query that simply references the party names and sole example of challenged (duty free) pricing Oliver alleges here. *See supra* 13.  It is also beside the point because Oliver's brief in this Court, like his briefing below, "cites no authority suggesting that, in addition to being publicly accessible, the disclosure must also be conspicuous or widespread." (JA 265 (citing contrary authorities).)  That is not surprising, because this Court has long recognized the bar's application to public disclosures—like "engineering blueprints on file with a public agency"—that would not meet Oliver's proffered test. *Quinn*, 14 F.3d at 655.

37

In sum, regardless how Oliver discovered or characterizes the publicly disclosed transactions underlying his claims, this suit relies on transactions substantially similar to those in the public domain, and thus constitutes precisely the kind of "opportunistic litigation" the FCA's jurisdictional bar is designed to "discourage." *Schindler*, 131 S. Ct. at 1894.  Accordingly, this Court should affirm the District Court's holding that the suit is subject to the FCA's public disclosure bar.

## B.     Oliver Cannot Escape the Jurisdictional Bar Because He Is Not an "Original Source" of the Allegations in His Complaint.

This Court should also affirm the District Court's holding that Oliver cannot avoid the jurisdictional bar on the grounds that he is an "original source" of the allegations underlying his complaint, because his contrary arguments, (OBr. 33-40), fail for several reasons.

### 1.     The SAC Fails to Plead Original Source

Oliver's original source claim fails, first and foremost, because the SAC does not  plead this basis for avoiding the FCA's jurisdictional bar.  (JA 12-25; 239.)  Oliver does not deny this.  He simply argues he "had no reason to plead" that he was an original source, because "he had no reason to anticipate [PM USA's] 'public disclosure' bar argument."  (OBr. 34 n.10.)  This assertion makes no sense and is belied by the record, because Oliver pled original source status in his original and First Amended complaints.  (*See* Dkt. 1, Compl. ¶ 2; Dkt. 8, First Am. Compl. ¶ 3.)  His failure to plead the same claim in the SAC is significant, be-

cause his original source allegations must be judged on his "complaint *as amend-ed*." *Rockwell*, 549 U.S. at 473.  If the rule were otherwise, a relator would be "free to plead a trivial theory of fraud for which he had some direct and independent knowledge and later amend the complaint to include theories copied from the public domain or from materials in the Government's possession." *Id*.

Oliver's approach to his original source claims here is even more troubling than the approach the Court admonished in *Rockwell*.  *See id.*  Oliver has amended his prior complaints, which contained multiple claims against additional parties and at least some original source allegations, to plead only a single MFC claim against PM USA alone based on public information unaccompanied by *any* original source allegations.  (JA 12-25.)  This admitted pleading failure, (OBr. 34), which Oliver had every opportunity to cure, alone supports affirmance.  *See United States ex rel. Gross v. AIDS Research Alliance-Chi.*, 415 F.3d 601, 606 (7th Cir. 2005) (affirming disclosure bar dismissal where relator "did not allege that he was an original source"); *Bernanke*, 557 F.3d at 676 (this Court may affirm a judgment on any ground fairly contested below); *Settlemire*, 198 F.3d at 173 (same).

### 2.    *Oliver Offers No Basis for Applying the Original Source Exception Even If It Were Properly Pled*

Oliver's original source claim also fails because his papers do not allege facts that would establish the claim even if he had properly pled it in the SAC. Section 3730(e)(4)(B) (2009) defines an "original source" as "'an individual who

has direct and independent knowledge of the information on which the allegations are based.'" *Quinn*, 14 F.3d at 656. This definition "impose[s] a conjunctive requirement—direct *and* independent—on *qui tam* plaintiffs." *Id.* "'Direct' signifies 'marked by absence of intervening agency.' [And] '[i]ndependent knowledge' is knowledge that is not itself dependent on public disclosure." *Id.* (citations omitted). The SAC, even as supplemented by Oliver's subsequent briefs and exhibits, does not come within a country mile of satisfying these tests.

Oliver's most detailed original source allegations are set forth in the declaration attached to his opposition below. (JA 206-07.) On the crucial issue of independent knowledge, the declaration states only that: "Through my relationships with the United States military and my involvement in the sale of tobacco products to NEXCOM, I became aware of the false claims alleged in this action." (JA 206, ¶ 3.) That is not enough. *See Iqbal*, 556 U.S. at 678; *Quinn*, 14 F.3d at 656; *Settlemire*, 198 F.3d at 918. As the District Court explained, these statements make no attempt "to explain how, exactly, [Oliver] learned of the alleged price differentials or of Defendant's participation in, or awareness of, the alleged fraudulent violations of the 'most favored customer' provisions." (JA 271.) They offer only "broad assertions of 'relationships' with unspecified members of the military" and "'involvement' in the sale of tobacco products," that are insufficient to establish the direct and independent knowledge required of an "original source." (*Id.*)

40

This ruling, which relies directly on this Court's precedents, *see Quinn*, 14 F.3d at 656, "reflect[s]" no "misconception about the requirements associated with the 'original source'" doctrine.  (OBr. 38.)  Nor does it improperly require Oliver "to demonstrate 'direct' knowledge of *all* the allegations underlying his Complaint."  *Id.* (emphasis original).  It simply rejects his belated "original source" allegations because they fail to show that he had "direct" knowledge of the elements of his claims "independent" of their disclosure in public sources.  (JA 271.)

That is exactly what this Court's precedents require.  Knowledge is "direct" if it is "first-hand," *Settlemire*, 198 F.3d at 918, and was not acquired through any "intervening agency."  *Quinn*, 14 F.3d at 656.  Oliver's assertion that he "never saw the Iceland Memo," (OBr. 37-38), misses the point, because the SAC fails to plead that he had "direct" and "independent" knowledge of the pricing policies the Memo discloses.  Indeed, his declaration suggests he did *not* have such knowledge, because it asserts that he "became aware of the false claims alleged in this action" through his "relationships with the United States military and [his] involvement in the sale of tobacco products to NEXCOM."  (JA 206, ¶ 3.)  Taken as true, both allegations suggest that Oliver's knowledge of PM USA's pricing policies was *not* "direct," but was instead obtained through "intervening agency," including government sources.  *Quinn*, 14 F.3d at 656.  Accordingly, and particularly when viewed in the broader context of this case, these allegations fail to show that Oliver

41

is an "insider[] with genuinely valuable information" rather than an "opportunistic plaintiff[]" with "no significant information to contribute of [his] own." *Id.* at 649.

### 3. Oliver's Original Source Claim, Even If Adequately Pled, Was Not Properly Presented to the Government Prior to Suit

Finally, even if Oliver's original source claim were otherwise adequately pled, it would fail because Oliver provides no basis on which the Court could conclude that he presented his original information to the Government "before filing this action[.]" 31 U.S.C. § 3730(e)(4)(B) (a relator may qualify as an original source only if he "voluntarily provided [his original] information [to] the Government before filing [his] action[.]"). Oliver's original source declaration states only that his November 2007 email to DoD disclosed "*an* on-going fraud against The United States Government, and, more specifically, its' [sic] Military Exchange Systems," allegedly "perpetrated by three major tobacco companies resulting in overpayments" by the exchanges. (JA 209 (emphasis added)); (*see also* JA 206-07, ¶¶ 4-5 (similarly stating only that he "informed the Department of Defense that [he] was aware of *an* ongoing fraud" and that he "spoke with" certain individuals "regarding the issues set forth in [his] e-mail") (emphasis added).)

As the District Court stressed, neither of these disclosures "mention[s] [PM USA's] alleged breaches of [AAFES or NEXCOM] 'most favored customer' clauses nor contain[s] any details that may have prompted an investigation into Defendant's pricing of products sold to NEXCOM and AAFES as compared to those

42

sold to its affiliates and/or duty-free civilian customers." (JA 272.) Accordingly, Oliver cannot show that before he filed this suit, he satisfied the FCA's requirement of providing the Government with original—*i.e.*, "direct and independent"—information about the specific MFC fraud he alleges. *Quinn*, 14 F.3d at 656.

Oliver's only response, (OBr. 36), does not avail him. He says it is "impossible" to reconcile "the district court's conclusion that [his] disclosure to the government was inadequate because [it] failed to specifically refer to PM USA's 'most favored customer' obligations . . . with [the court's] earlier conclusion that the Iceland Memo 'publicly disclosed' the fraudulent 'transaction' underlying the Complaint even though it made no reference at all to PM USA's 'most favored customer' obligations." (*Id.*) Oliver is wrong, and the District Court's conclusions are perfectly reconcilable, because the disclosures that trigger the FCA's jurisdictional bar are *not* coextensive with the requirements for pleading an original source claim. Indeed, Oliver's own cases confirm that the original source inquiry arises only where the public disclosure bar would otherwise apply. (OBr. 37 (citing *Davis*, 679 F.3d at 836).)

As *Davis* explains, the public disclosure bar "prevents suits by those other than an 'original source' when the government *already* has enough information 'to investigate the case and to make a decision whether to prosecute' or where the information 'could at least have alerted law-enforcement authorities to the likelihood

of wrongdoing.'"  *Davis*, 679 F.3d at 836 (emphasis added; quoting *Quinn*, 14 F.3d at 654).  Accordingly, the District Court's conclusion that the Iceland Memo contained allegations sufficient to trigger the bar, (JA 264-69), is not just "reconcilable" with the court's ruling on original source.  (OBr. 36.)  It is the trigger for the original source inquiry, which a court can resolve by finding that a relator is an original source of his allegations, or that he is not.  *See Davis*, 679 F.3d at 836.

In *Davis*, this Court rejected the relator's contention that two "vague" letters he sent to Medicare "alleging 'Medicaid fraud' and 'diversion of Medicare funds'" "were sufficient" to qualify him as an "original source," and allowed the suit only because the relator later produced a *third* letter showing that he "informed the Inspector General of the U.S. Department of Health & Human Services" of his specific fraud allegations before he filed his complaint.  679 F.3d at 837.  Here, there was no proverbial "third letter."  Oliver's September 2012 declaration, (JA 206-07), like his November 2007 email, (*id*. 209), contains no information about the MFC-specific fraud he alleges here.  (JA 206-09.)  Accordingly, the District Court correctly held that he "failed to demonstrate that he disclosed to the Government direct and independent knowledge of the fraud alleged in his Complaint," and "therefore failed to show that he is entitled to the 'original source' exception to the FCA's public disclosure bar."  (JA 273.)

This Court should affirm this ruling for the reasons above, and because the balance of the record shows that Oliver is *not* a whistleblowing "insider," but a disgruntled competitor who already has every incentive to bring fraud claims against PM USA, regardless how unsupported or unoriginal.

## II.    AFFIRMANCE IS ALSO WARRANTED ON THE ALTERNATE GROUND THAT OLIVER CANNOT PLEAD AN FCA CLAIM.

Oliver's brief does not mention the Rule 12(b)(6) grounds for dismissal PM USA presented below. (JA 51-66.) But his brief confirms that they present an alternate basis for affirming the District Court's judgment. *See, e.g.*, *Bernanke*, 557 F.3d at 676; *Settlemire*, 198 F.3d at 173.

Given the strength of the District Court's public disclosure analysis, it is no surprise that Oliver devotes much of his brief to arguing that he is entitled to proceed despite the public disclosure of the transactions underlying his complaint. In addition to asserting that he is an "original source," (OBr. 33-40), he insists that if the combination of MFC requirements and pricing disparity in the Iceland Memo is good enough to trigger the FCA's jurisdictional bar, this same combination of information (which comprises the bulk of his 14-page SAC) must be sufficient to state an FCA claim. (*E.g.*, OBr. 36.) He is wrong because he again improperly conflates the standard for applying the FCA's jurisdictional bar with the standard for pleading an FCA claim under Federal Rules of Civil Procedure 8 and 9(b). As noted, *see* Part I.A *supra*, they are not the same.

45

To state an FCA claim, Oliver must plead facts sufficient to show that PM USA "knowingly present[ed], or cause[d] to be presented" to an officer or employee of the United States Government "a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1). And to do that, he must satisfy not only Rule 8's requirement of pleading an FCA violation that is "plausible on its face," *Iqbal*, 556 U.S. at 678, but also Rule 9(b)'s requirements for pleading the "who, what, where and when" of the alleged fraud. *See, e.g.*, *United States ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 551-52 (D.C. Cir. 2002) ("[B]ecause the [FCA] is self-evidently an anti-fraud statute, complaints brought under it must comply with [the requirement under] Rule 9(b)"). For the reasons PM USA addressed below and Oliver's brief highlights, the SAC meets none of these requirements.

## A.    Oliver's Brief Confirms That He Cannot Adequately Plead the MFC Violations on Which His FCA Claims Depend.

The jurisdictional arguments in Oliver's brief underscore the first of his many pleading failures, namely, his failure adequately to allege the MFC violations on which his FCA claims rest. (*See* OBr. 10); (JA 19-21 ¶¶ 30-37); *SAIC*, 626 F.3d at 1271 (explaining that false certification claims require knowing "violat[ion] [of] a contractual obligation"). Oliver concedes that the MFC requirements he cites depend not only on the price, but also on the "terms and conditions," of the

46

cigarette sales he challenges.  (OBr. 9-10.)[6]   Accordingly, he concedes that to

plead a "plausible" case of MFC-based fraud, *Iqbal*, 556 U.S. at 678, he must plead

facts sufficient to show that the sales in issue involved comparable products, terms,

conditions, customers, and markets.  (*See* OBr. 9-10); (JA 15-16); *U.S. Foodser-*

*vice, Inc. v. United States*, 100 Fed. Cl. 659, 684 (2011) (MFC provisions must be

limited to "similarly situated" customers to be "acceptable" for government use).

The SAC does not come close to pleading such similarities.  (*See* JA 51-67;

183-203; 242-50.)  Its passing references to unspecified sales to unnamed custom-

ers, (JA 18-19 ¶¶ 25-29), are precisely the kind of "threadbare" allegations that

cannot survive a motion to dismiss.  *Iqbal*, 556 U.S. at 678; (JA 51-67; 242-50).

And Oliver's brief simply underscores this point by reiterating the SAC's insuffi-

cient allegations in ways that highlight their failure to plead "comparable" sales.

(OBr. 10-11 (citing JA 18-19, ¶¶ 25-29).)   Apart from being publicly disclosed

(and thus jurisdictionally off-limits), *see* Part I, *supra*, the few pricing details Oli-

ver's brief offers do *not* compare the prices or terms on which PM USA sold the

relevant cigarettes to AAFES and NEXCOM with the prices or terms on which PM

USA allegedly sold the same cigarettes to comparable purchasers operating in

---

[6] (*See also* JA 15-16 (admitting that the relevant AAFES provisions apply only to products sold to other customers under the "same or similar" *prices, terms, and conditions*)); (JA 15 (similarly admitting that PM USA's MFC obligations to NEXCOM turn on whether the "*prices, terms and conditions offered*" to NEXCOM "exceed prices *then being charged* the Contractor's most favored customer or another military exchange for *like items*.").)

analogous foreign markets.  (OBr. 10-11); (JA 18, ¶¶ 25-26).)  Rather, his brief, like the SAC, compares the prices at which PM USA allegedly sold the cigarettes to AAFES and NEXCOM with the prices PM USA charged for cigarettes it contract-manufactured for corporate affiliates PMI and PM Duty Free, (OBr. 10-11); (JA 18, ¶¶ 25-26)),[7] and then tries to establish comparability by referencing the prices at which these affiliates sold the cigarettes to foreign distributors who then "*re-sold*" them to "foreign purchasers" and "civilian duty free" customers.  (OBr. 10-11; JA 18, ¶ 25); (*see also* OBr. 11; JA 18, ¶ 26) (comparing the price PM USA allegedly charged NEXCOM for a carton of Marlboro cigarettes it purchased "for the Navy on Guam" with the price that unspecified PM USA "affiliates" allegedly charged civilian distributors for cartons of Marlboro "to the duty-free market on American Samoa"). )

These allegations do not plead the kind of pricing conduct Oliver admits his claims require:  namely, PM USA's failure to "offer" AAFES and NEXCOM the lowest price offered other customers for "comparable" sales of the same product in similar markets.  (OBr. 10-13.)  Nor do other portions of the SAC assert such conduct.  (JA 17-19, ¶¶ 20-29.)  The complaint does not plead that similar terms and

---

[7]  Public SEC filings PM USA introduced below show that, from at least 2003 until 2008, PM USA was a "contract manufacturer" for PMI, (JA 86-129), responsible only for manufacturing cigarettes for PMI, *not* for marketing or selling them overseas.  (*See, e.g.*, JA 88); (*see also id.* 128 (noting that PM USA's "contract manufacturing for PMI" was "terminated in the fourth quarter of 2008")).)

conditions applied to the only specific sales it identifies as evidence of the alleged MFC violations—sales of cigarettes by PM USA to corporate affiliates further up the distribution chain than AAFES or NEXCOM. Nor does it plead that PM USA failed to "offer" such terms to AAFES and NEXCOM, which is what the relevant MFC provisions actually require for a breach.[8] These pleading failures are particularly significant here not only because Oliver has had ample opportunity to correct them, but also because the public SEC filings PM USA introduced below, (JA 79-145), which Oliver's brief adopts, (OBr. 10 n.4), show that PM USA's sales to the only two corporate affiliates (PMI and PM Duty Free) the SAC specifically identifies, (OBr. 10; JA 18, ¶25), were *not* "comparable" to AAFES and NEXCOM sales in any respect relevant to MFC compliance. (OBr. 11); (JA 18, ¶ 26.)

These SEC filings show that, from at least 2003 to 2008 (when PMI was spun off and ceased purchasing product from PM USA altogether), PM USA "contract manufactured" cigarettes for PMI. (*See supra* n.8; JA 83, 90, 98, 105, 113, 121.) And they further establish that, to the extent PMI (or PM Duty Free in its capacity as a PMI subsidiary, (*see* JA 147-50), purchased product from PM USA

---

[8] (*See, e.g.*, JA 15, ¶ 16 ("In the event the Contractor subsequently agrees to sell the item to another customer at a lower price, the Contractor is obligated to promptly *offer* the lower price, in writing, to the Contracting Officer [for AAFES].").)

during the period covered by the complaint,[9] the purchases were on terms and con-

ditions presumptively different from the Government wholesaler relationship the

SAC describes between PM USA and AAFES/NEXCOM.  (JA 14-16, ¶¶ 10-19);

*see also Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1222, 1226

n.6 (D.C. Cir. 1993) (court may examine matters of public record in deciding dis-

missal motion).  These publicly-disclosed distinctions between PM USA's affiliate

and military sales validate the "innocuous" explanation for the only specific price

disparity Oliver alleges, (OBr. 10, 26, 32), and provide further evidence that this

case was properly dismissed because it challenges sales that do not implicate

(much less violate) the MFC provisions on which Oliver's FCA claims depend.

### B.     Oliver's Brief Also Confirms That He Cannot Adequately Plead the Elements of His FCA Claims Under Rules 8 and 9(b).

Even if Oliver could plead an MFC violation (he cannot), his brief confirms

that he does not plead any of the remaining elements of his FCA claims for the ad-

ditional reasons PM USA explained below.  (JA 45-67; 242-50.)  Specifically, he

---

[9]  Altria's SEC filings document that Altria Group spun PMI off in March 2008, and PMI stopped purchasing cigarettes from PM USA altogether in December 2008.  (*See* JA 126-28) (describing the PMI spin-off, the "notice from PMI that it would no longer source cigarettes from PM USA," and the "end[]" of "cigarette production for PMI" in "December 2008")).)  These filings provide an additional reason to affirm the dismissal of all allegations regarding post-2008 sales to PMI. *See, e.g.*, *Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004) (a court is not obliged to accept allegations that contradict documents subject to judicial notice).

fails to plead fraud with particularity or the materiality and scienter required for FCA liability.

### 1.     *Oliver Fails Adequately to Plead Fraud*

In the paradigmatic FCA case, "a claim is false because it involves an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided." *SAIC*, 626 F.3d at 1266 (internal quotation marks omitted). This is not a paradigmatic case. Oliver instead "relies on the so-called 'certification theory' of liability" under which "a claim for payment is false when it rests on a false representation of compliance with an applicable . . . contractual term." *Id.* (quotation marks omitted). The SAC pleads no such thing.

"False certifications can be either express or implied. Courts infer implied certifications from silence where certification was a prerequisite to the government action sought." *Id.* The SAC does not adequately plead any false certification, express or implied, as Oliver effectively conceded in attempting to excuse this pleading failure on the grounds that he "has not yet been afforded discovery in this action." (JA 19-20, ¶¶ 30, 34.) That is no excuse. "Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79; *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 380 (4th Cir. 2008) ("[I]f allowed to go

forward, Relators' FCA claim would have to rest primarily on facts learned through the costly process of discovery.  This is precisely what Rule 9(b) seeks to prevent.").

For the reasons the parties briefed below, (JA 58-61; 191-97; 242-47), the SAC "fails to identify with specificity who precisely was involved in the fraudulent activity," and does not "explain[] the role these [unspecified] individuals played in the alleged fraud."  *United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1257 (D.C. Cir. 2004).  Accordingly, the judgment warrants affirmance on the ground that the SAC fails to plead fraud as required by Rule 9(b).  *See, e.g.*, *Bernanke*, 557 F.3d at 676.

## 2.    *The SAC Also Fails Adequately to Allege Materiality and Scienter*

Although the foregoing pleading defects alone compel dismissal, the SAC fails to state an FCA claim for the additional reason that it does not properly allege materiality and scienter.  This is not a technical failure.  It goes to the heart of Oliver's inability to plead two elements that this Court has identified as critical to ensuring that relators do not "abuse" *qui tam* suits by using implied certification claims to "convert[]" "ordinary breaches of contract" into "FCA liability" and the draconian penalties that accompany it.  *SAIC*, 626 F.3d at 1270-71; *see also United States ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.*, 214 F.3d 1372, 1378 (D.C. Cir. 2000) (emphasizing that courts must strictly enforce pleading requirements in

FCA actions to ensure that such suits do not "unilaterally divest[] the government" of its "discretion to accept or disaffirm [its] contract[s]").[10]

*Materiality*.  Even if the Court assumes that compliance with MFC provisions is generally material to the Government's payment of supplier invoices *and* that Oliver has adequately pled an MFC violation, (*but see* Part II.A, *supra*), Oliver must still plead a plausible case that the *particular* misrepresentations he describes were "material to the government's decision to pay" the *particular* claims for which he seeks FCA damages.  *SAIC*, 626 F.3d at 1271.  He does not, and evidently cannot, do so.  All the SAC offers on this point is the conclusory statement that "PM USA's false statements were material to defendant's false claims for payment and influenced the decision by NEXCOM to pay such claims."  (JA 20-21, ¶¶ 33, 37 (same referencing AAFES).)

That is plainly inadequate.  In *SAIC*, for example, the Court found materiality only after the United States itself pled that it would not have awarded the affected contracts had it known of the alleged fraud, and then proved this allegation through the testimony of "numerous witnesses" who stated that the alleged misrepresenta-

---

[10] The false certifications Oliver asserts in the SAC are implied certifications because the SAC alleges only that PM USA breached MFC provisions set forth in "purchase orders or other forms of contract" issued by the Government, *not* in any claim PM USA allegedly submitted to AAFES or NEXCOM.  (JA 19-21, ¶¶ 30-38); *SAIC*, 626 F.3d at 1267 (finding no express certification because the "actual claims for payment . . . were accurate reports of services rendered that made no reference to" compliance with contractual warranties).

tions were both "important to the overall purpose of the contract" *and* would have caused the relevant "contracting officers and specialists" not to "award[] the two contracts" or make "payments under those contracts" had they known of the alleged misrepresentations. *E.g.*, *SAIC*, 626 F.3d at 1271 (internal brackets omitted, emphasis added). Oliver's concession that the Government has "continue[d] to contract" with PM USA despite his allegations, (JA 269), highlights his pleading failure and distinguishes this case from precedents, like *SAIC*, in which the Government responded to viable claims of material fraud by intervening, suspending relevant contracts, or both. *See SAIC*, 626 F.3d at 1263 (upon learning of the alleged breach, the Government "informed [the defendant] and ordered the company to stop working on the 1999 contract").[11]

*Scienter*. The SAC's failure adequately to plead that PM USA *knowingly* submitted false certifications to the Government, (JA 63-67; 247-50), provides yet another independent ground for affirming the District Court's judgment. The SAC's only statement on this point—its conclusory assertion that PM USA "knowingly charged . . . prices for its cigarette products that violated the 'most favorable customer' warranties," (JA 17, ¶ 24)—is clearly insufficient to satisfy *Iqbal*'s plausibility standard. *See* 556 U.S. at 678 (explaining that the "sheer possibility" of

---

[11] Oliver's only response below was that the Government must have acquiesced in the multi-billion dollar fraud he alleges because it did not want to "abandon the world's top-selling cigarette brands." (JA 167.)

wrongdoing is "insufficient to satisfy Rule 8"); *Atherton*, 567 F.3d at 681-82.

As this Court has explained, the FCA is not a "vehicle for either 'punish[ing] honest mistakes or incorrect claims submitted through mere negligence' or imposing 'a burdensome obligation' on government contractors." *SAIC*, 626 F.3d at 1274 (citation omitted). Accordingly, Oliver must plead a "plausible" case that PM USA *knew* "that it violated a contractual obligation" and "that its compliance with that obligation was material to the government's decision to pay." *SAIC*, 626 F.3d at 1271. Further, and critically, he must do so "based on the proper standard for knowledge—which . . . *excludes collective knowledge*." *Id.* (emphasis original). The SAC does none of these things. It contains only conclusory assertions of precisely the kind of "collective knowledge" this Court has rejected as a basis for FCA claims because it would "effectively impose[] liability, complete with treble damages and substantial civil penalties, for a type of loose constructive knowledge that is inconsistent with the [FCA's] language, structure, and purpose." *Id.*

The SAC's failure to plead the knowledge required for an FCA claim is not surprising. (JA 17-19 ¶¶ 24-29.) The Government has been on notice of his allegations since at least January 2008 (when he filed his sealed complaint), and the Iceland Memo suggests that the Government was aware of the essential elements of his claims as early as 1999. (JA 71.) Yet the Government declined to intervene in this suit, and has "continued to purchase" cigarettes from PM USA despite Oli-

55

ver's claims of fraud.  (JA 269.)  This case is thus easily analogized to those in

which the Government's knowledge of, or cooperation with, a contractor's actions

is so extensive that the contractor could not as a matter of law possess the requisite

state of mind to be liable under the FCA.  *See, e.g.*, *United States ex rel. Harrison

v. Nat'l Semiconductor Corp.*, 105 F.3d 650, 1997 WL 3637, at *1-2 (4th Cir. Jan.

7, 1997) (table op.) (noting in upholding dismissal of FCA claim that  "the case

contains no fraud because the NSA was happy with what it received despite

knowledge of the allegedly false claims"); *United States ex rel. Durcholz v. FKW,

Inc.*, 189 F.3d 542, 545 (7th Cir. 1999) ("[T]he government's knowledge effective-

ly negates the fraud or falsity required by the FCA.")

## CONCLUSION

    As Oliver's own brief makes clear, this case is a far cry from the whistle-

blower actions the FCA encourages to expose fraud unknown to the Government.

It is a case in which a competitor seeks extraordinary damages and a personal

bounty for purportedly exposing as "fraudulent" business and pricing conduct that

is documented on the Internet, was disclosed to the Government through civil liti-

gation and through communications between PM USA and military exchange rep-

resentatives, and that the Government has investigated and declined to pursue

through intervention or termination of the allegedly affected contracts.  Not sur-

prisingly given this backdrop, the SAC fails to plead a viable FCA claim under the

Act's jurisdictional provisions or the Federal Rules of Civil Procedure. Accordingly, PM USA respectfully requests that this Court affirm the judgment below, either for the jurisdictional reasons in the District Court's thorough opinion, or on the alternative ground that Oliver fails to state an FCA claim.

Respectfully submitted,

/s/ Elizabeth P. Papez

THOMAS J. FREDERICK
*Winston & Strawn LLP*
*35 W. Wacker Drive*
*Chicago, IL 60601*
*(312) 558-5600*

ELIZABETH P. PAPEZ
ANDREW C. NICHOLS
ERIC M. GOLDSTEIN
ERIC T. WERLINGER
*Winston & Strawn LLP*
*1700 K Street, N.W.*
*Washington, DC 20006*
*(202) 282-5000*
*epapez@winston.com*

*Counsel for Appellee*
*Philip Morris USA Inc.*

NOVEMBER 25, 2013

## CERTIFICATE OF SERVICE

I hereby certify that I have, on this 25th day of November, 2013, served a copy of the foregoing Opposition Brief of Philip Morris USA Inc. by electronic filing on the following:

Carl S. Kravitz
Jason M. Knott
ZUCKERMAN & SPAEDER LLP
1800 M Street, N.W.
Suite 1800
Washington, DC 20036
Telephone: (202) 778-1800
Facsimile: (202) 822-8106
ckravitz@zuckerman.com
jknott@zuckerman.com

David S. Golub
Silver Golub & Teitell LLP
184 Atlantic Street
P.O. Box 389
Stamford, CT  06904
Telephone: (203) 325-4491
Facsimile:  (203) 325-3769
dgolub@sgtlaw.com

*Counsel for Plaintiff-Appellant*
*Anthony Oliver*

/s/ Elizabeth P. Papez
ELIZABETH P. PAPEZ

*Counsel for Appellee*
*Philip Morris USA Inc.*

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure ("FRAP") 32(a)(7)(B) because:

   This brief contains 13,795 words, excluding the portions exempted by FRAP 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6) because:

   This brief has been prepared in a proportionally spaced, 14-point, Times New Roman typeface using Microsoft Word 2010.


   /s/ Elizabeth P. Papez
   ELIZABETH P. PAPEZ

   *Counsel for Appellee*
   *Philip Morris USA Inc.*